Cite as 2023 Ark. App. 24

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CV-21-569

| | |
|---|---|
| CITY OF FORT SMITH<br><div align="right">APPELLANT</div><br>V.<br><br>B&A ELECTRIC, INC.; MEGEHEE FENCE CONTRACTING, LLC; GRIMES DOZER SERVICE, INC.; JAMES GRIFFITH; AND RIVER VALLEY SPORTS COMPLEX, INC.<br><div align="right">APPELLEES</div> | Opinion Delivered January 25, 2023<br><br>APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT<br>[NO. 66FCV-17-285]<br><br>HONORABLE STEPHEN TABOR, JUDGE<br><br>REVERSED AND DISMISSED |

**WAYMOND M. BROWN, Judge**

The City of Fort Smith (the City) appeals the Sebastian County Circuit Court's entry of judgment against it following a jury verdict on breach-of-contract claims brought by appellees B&A Electric, Inc.; Megehee Fence Contracting, LLC; Grimes Dozer Service, Inc.; and James Griffith (the contractors), hired by third-party defendant River Valley Sports Complex, Inc. (RVSC). The City contends that the evidence was insufficient to support the judgment in favor of the contractors. We agree. Therefore, we reverse and dismiss this action.[1]

---

[1]This is the third time this case has been before us—we dismissed it twice for lack of a final order. *See City of Fort Smith v. B&A Electric, Inc.*, 2019 Ark. App. 575; *City of Fort Smith v. B&A Electric, Inc.*, 2021 Ark. App. 334.

The City and RVSC entered into a written contract in March 2014 for the construction of a sports complex on city-owned land after RVSC principals Jake Files and Lee Webb presented the project to the city board. The City agreed to contribute up to $1.6 million in amounts payable when construction reached specific milestones. RVSC solicited donations to cover the remaining costs of the project. The contract required RVSC to complete the project by June 10, 2015, but stated that after construction was complete, the City would lease the complex back to RVSC for ten years.

RVSC began work on the project in 2014, and it hired the four appellees as contractors to provide materials and services. By the scheduled completion date, however, RVSC had not substantially completed the work. Work continued into 2016 as a result of two negotiated extensions granted by the City. The City paid RVSC over $1.08 million, but in early 2017, RVSC permanently ceased working on the project after having failed to meet the deadline extensions. When RVSC abandoned the project, it owed all four contractors payment for work and materials they had already provided. The contractors sought payment from RVSC, but RVSC did not have sufficient funds to pay. The contractors then sued the City for breach of contract and unjust enrichment. The City filed a third-party complaint against RVSC for breach of contract and contractual indemnity.

The case went to trial before a jury in September 2018. Terry Bailey, the bookkeeper and corporate secretary for Grimes Dozer Service, testified that she compiled and submitted invoices to RVSC between 2014 and 2016. She stated that Grimes had been paid for all the work performed except $12,977.50 for which it was seeking judgment against the City.

2

On cross-examination, Bailey stated that all the invoices were directed to Webb because its agreement was with RVSC. She said that it billed RVSC and received payments from RVSC. She denied ever receiving checks from the City. She testified that Grimes billed the City on advice from its attorney to do so after work on the project had stopped. She said that Grimes was not paid after July 2016 "because RVSC did not receive another draw from the City because RVSC had not completed the next phase, and there was no money to pay us."

On redirect, Bailey stated that she knew the land was owned by the City and that in her mind, "the City would direct the money to RVSC and then to us."

Brian Buzbee, part owner of B&A Electric, testified that he submitted budget numbers to the City to provide lights, poles, and concrete bases for the softball fields in 2014 and that the City subsequently passed a resolution with that bid exhibited. He stated that it received $40,000 as final payment, but it was expecting $100,000. He said that RVSC told B&A Electric that "we weren't getting any more money from the City." He testified that he met with his supplier, Upchurch Electric, and the city auditor, Tracey Shockley, and looked at the site and what had been done up to that point. He said that he subsequently pulled out all the panel "guts" and wiring it had installed to protect it from vandalism. He stated that it had completed all the work for which invoices were submitted to RVSC or the City. Buzbee testified that he attended a city board of directors meeting in March 2017 to inquire about why RVSC was not required to submit a performance bond and was told by Michael

3

Lorenz that "the City viewed it as a collaboration between the City and RVSC." He stated that it is still owed $151,880 for which it was seeking judgment against the City.

On cross-examination, Buzbee testified that all the invoices were directed to Webb, never the City. He further testified, "We never received any document from the City indicating we had won a bid. We have no agreement with the City that it will be responsible for the goods and services we delivered to the project, but the City has possession of the boxes and light poles."

On redirect, Buzbee stated that the City's resolution referenced $458,000, the exact amount of B&A Electric's bid. He contended that the City had not offered to pay B&A anything on the remaining balance.

James Griffith testified that he was hired by RVSC to do some woodwork for the project. He stated that he kept his costs at a certain level as requested by Webb. He said that he put up walls, set roof trusses, put roof decking in, and wrapped the buildings. He stated that he completed everything he was contracted to do and was still waiting to be paid the $20,337 for which he was seeking judgment against the City. He said that he contacted Webb for payment and attempted to contact the City three times, but the City never called back. He stated that although Webb was running the project, "we all believed the City was paying payments based on completion milestones."

On cross-examination, Griffith stated that he gave a verbal bid to Webb and that he had no written agreement with the City to pay for his services. He stated that Webb

4

approved everything he did. He said that he realized he would not be paid when the City shut down the project. He further testified,

> I put the responsibility on the City because it halted the project and stopped the funding. I decided to sue the City because the City controlled the money. I have no written or verbal agreement with the City. No representative of the City told me the City would cover my expenses for the project.

On redirect, Griffith said that it was common for him not to receive verbal or written agreements for payment. He stated that ordinarily, he could file a lien for nonpayment, but that is not an option against the City.

Shawn Megehee[2] testified that he is the owner of Megehee Fence Contracting, LLC. He said that he was asked by Webb to perform work for the project and that he was aware that the project was on land owned by the City. He said that his company installed all the fencing per the agreement. He also stated that he left materials in Webb's yard and warehouse that subsequently disappeared. He testified that he billed RVSC for $45,482.08 but only received payment in the amount of $30,500. He was seeking judgment against the City for the remaining amount owed.

After the close of the contractors' case, the City moved for directed verdict on both claims. The court denied the motion.

Jeff Dingham, deputy city administrator for the City of Fort Smith, testified that the City was initially contacted by Files and Webb in 2011 about a sports complex. He said that

---

[2]The transcript reflects the last name as McGehee, but for purposes of this opinion, we will refer to it as Megehee.

at that time, the City did not own the land in question. He stated that the agreement was not considered by the board of directors until March 2014. He testified that the City was to contribute up to $1.6 million, to be paid incrementally upon the accomplishment of construction milestones as set out in the agreement and that the estimated total cost for the construction was about $6 million but that RVSC was to seek donations of time, materials, and labor to get the project completed. He admitted that the project was not bonded, but he stated that Files and Webb offered financial assurances in lieu of a bond. He said that RVSC made personal financial guarantees and RVSC assured the City that it would be successful in seeking donations of money, time, and materials to complete the project. He stated that the City was not actively involved in the management of the project and that Files and Webb handled all arrangements for providing contractors, supplies, and vendors. He said that RVSC never requested the City to compensate any suppliers, vendors, or construction services. He testified that the City agreed to two extensions when RVSC did not meet the original completion date of July 1, 2015, and that at the end of the second extension in July 2016, RVSC asked for more time because the project was still not complete. However, he stated that they never entered into specific discussions about more time. He testified that RVSC submitted a timeline showing a completion date of November 15, 2016, which it did not meet; and it submitted another proposed schedule showing a completion date of December 20, 2016, which it also failed to meet. Dingham stated that by December 2016, a lot of the responsibility for the project had shifted to Carl Geffken, the city administrator.

On cross-examination, Dingham stated that he knew RVSC was a non-profit organization that was unfunded and had no assets, making it virtually impossible for it to secure a performance bond. He acknowledged that the City entered into a construction contract with RVSC in spite of this. He stated that the City acquired ownership of the property for the project in 2012. He denied that the City sent any engineers or architects to investigate whether this was a feasible project to complete until everything "went bad." At that time, he said that the City developed an accounting of what was on the property as compared to what the City had paid toward the project. He stated that the value of the goods and services was commensurate with the amount the City had paid out; that RVSC was selling the City a completed complex of structure, fencing, and ball fields to be owned by the City; and that the agreement set out the specifications and standards for the complex for which RVSC was required to adhere. He testified that $1.6 million was earmarked for the project and that there was still money remaining in the budget. He further testified,

> The City was observing and monitoring the project. Parks and Recreation Department employees were out there frequently. The City knew that contractors had been retained by RVSC and doing work on the project. The City did not have a specific relationship with the other contractors. This project was significantly underfunded. The City's position is that it has a contract with RVSC, not with the other contractors. No performance bond or surety was obtained in July 2015 when the first extension was agreed [to]. The City did not do anything to secure payment to the contractors who worked on the project, or to get a personal surety bond from Webb or Files, or to warn the contractors they might not get paid. The City had no relationship with any of the contractors and it did not contact any of them.

> The City did not distribute any money without RVSC having met the construction milestones. At some point the City requested to look at RVSC's checks written and bank statements, and to see exactly what funds had been paid out by RVSC. City employees were on the property periodically, every day in some weeks, seeing what

7

was going on. The agreement was a contract between the City and RVSC for the construction of this complex on City-owned property. RVSC had no other sources of income to my knowledge. The City paid RVSC $1.08 million. The City passed resolutions allowing all this to happen. The Financial Assurances document in Exhibit 1 lists items that needed to happen on the property for the project to occur and where different components would come from. Assurances were provided to the satisfaction of the Board of Directors, but there were no assurances in the conventional sense.

On cross-examination by RVSC, Dingham stated that a report prepared by Morrison-Shipley Engineers showed that the value of work the City received was $1.18 million, $100,000 more than what the City had paid out. He stated that the agreement was terminated because of delays and that he believed city employees picked up materials and some donated air conditioners from Webb's place. He testified that the City requested RVSC's bank statements, check ledgers, and documents, which were provided as requested.

On redirect, Dingham stated that the City estimated that an additional $3.5 million would be required to complete the project. He said that as deputy city administrator, he had no confidence that RVSC would be able to deliver what it promised to deliver in the agreement.

On recross, Dingham stated that the financial-assurances document was never thought of as a bond but as a way to make the project happen. He admitted that the lack of a bond had put the contractors and other people in a terrible position.

Carl Geffken testified that he was the city administrator for the City of Fort Smith and had served in that capacity since May 16, 2016. He stated that the City wanted the project to succeed; however, after RVSC failed to meet the extended deadlines for

8

completion, he recommended that the City explore termination of the agreement. He stated that Files approached him about getting General Improvement Fund (GIF) money for sewer and water improvements on the property and that he was able to secure $45,070 in GIF money. He testified that he paid $26,945 of that money to DiAnna Gonzales for work on the project. He stated that the board of directors asked RVSC to submit a revised estimated date of completion by January 31, 2017, and that a completion date of September 2017 was subsequently given. He stated that Shockley requested bank statements, checks, and other information from RVSC. He testified that on February 1, he issued a cease-and-desist order to ensure nothing went into or came out of the sports complex. He stated that on February 3, Files called him to talk about withdrawing from the contract, but he had already told Files that the contract would probably be terminated. On February 7, Geffken stated that the board of directors approved a resolution to terminate the contract with RVSC. He stated that RVSC did not offer to cure any default in the contract and that some of the contractors called the City requesting payment. He testified that in his view, this was a public-private partnership like another partnership the City was involved in at the time. He stated that there is $520,000 left in the City's budget for the project. However, he said that engineers estimate that it will cost a total of $5 million to complete the project, far more than what remains in the budget.

On cross-examination, Geffken testified that the City decided it was not going to pay anyone else based on its relationship with RVSC. He stated that the City's money was just the "seed money to help fill the gaps." He said that the sports complex was a collaboration

in which the City contributed $1.6 million and RVSC was to achieve donations of $3 million through contributions or direct funding, that RVSC was not a project manager, and that the City did not hire the contractors. He testified that it was in the scope of the business plan for RVSC to have money to hire contractors and that RVSC was on the hook to make the payments. He indicated that surety bonds are never a requirement, but it is the proper thing to do. However, he stated that the board of directors decided to go forward with what was unconventional. He said that he did not dispute that the contractors performed the work for which they sought payment but that the City had no intention of paying them. He said that the City found out that RVSC had no funds, but that was not the original plan as he understood it. He admitted that there is enough money left in the City's budget to pay the contractors.

On cross-examination by RVSC, Geffken stated that he recommended to the board of directors in December 2016 that the contract with RVSC be terminated. He said that RVSC's notice of withdrawal came on February 3.

On recross, Geffken stated that he would like for RVSC to honor the contract it had with the contractors it hired. He denied that the contractors provided goods and services to the City but contended they did so for RVSC. He admitted that the City was going to own the complex.

Tracey Shockley testified that she is the internal auditor for the City of Fort Smith. She said that she first knew of the project in January 2017 after a board of directors study session when she was asked to look into it. She stated that she met with Buzbee and agreed

that he could remove his materials from the job site. She said that she also spoke with Megehee about materials he had left at the job site but learned from Webb that those materials had already been paid for. She said that Megehee left, and the City made arrangements with Webb to secure all the items.

Lee Webb testified that he and Files were the organizers of RVSC. He stated that the purpose of RVSC was to create a softball complex to host tournaments. He said that Fort Chaffee donated 62.5 acres of property to the City and that there were various other donations made to the project. He stated that when certain thresholds were met, the City would send an inspector out, a check would be issued for the work, and he would then pay the contractors. He testified that it was communicated to the City that RVSC did not have any assets. He said that in January 2017, the City asked for a new completion deadline. He stated that RVSC provided bank statements and a breakdown of what the contractors were owed, as requested by the City. He said that he attended the study session in January 2017, and there was no mention of terminating the agreement at that time. He stated that he received a letter on February 1 requesting RVSC to cease and desist from doing work on the project; that RVSC subsequently sent a withdrawal letter to the City on February 3; and that RVSC received a letter of termination on March 17. He testified that after termination of the contract, he cooperated with the City to pick up materials, including air conditioning units, backstop poles, and fencing. He opined that the materials picked up by the City were already paid for.

On cross-examination by the City, Webb stated that RVSC had not met any of the deadlines as set out in the agreement and extensions and that he hired all the contractors and they answered to him. He said that the contractors billed RVSC and that he paid them. He stated that he did not send the contractors to the City to be paid because RVSC was responsible for paying them once the draw money came in. He testified that RVSC received payments from the City for the contract thresholds that were completed.

On cross-examination by the contractors, Webb stated that the agreement with the City was drafted by the City's attorneys. He said that the agreement set forth what RVSC could and could not do in developing the property as well as the design, the standards of construction, the time for completion, and the payment schedule. The agreement also waived a performance bond. He testified that the only money in RVSC's account came from the City, with the exception of a refund for pallets and that the contributions from third parties were materials or materials at cost. Webb testified that the City monitored the work being performed, controlled all the money, inspected the work, and subsequently stopped the contract. He stated that the contractors performed all the work they invoiced and are owed all the money they are claiming. He said that the City gave RVSC authority to hire the contractors and that RVSC was going to benefit by being allowed to lease the property for ten years after completion. He said that RVSC received no payment or management fees. He opined that this was a collaboration between two parties.

At the close of all evidence, the City renewed its motion, which the court again denied. The jury returned verdicts in favor of the contractors for the full amount of their

requested damages on both their breach-of-contract claims and their unjust-enrichment claims.[3] The jury found in favor of RVSC on the City's third-party claims. The parties agreed that the jury's verdicts granting relief to the contractors on their breach-of-contract and unjust-enrichment claims were incompatible, and with the consent of the parties, the court entered judgment against the City on only the contractors' breach-of-contract claims. The City now appeals.

In reviewing a jury's verdict, our appellate courts determine whether it is supported by substantial evidence.[4] Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other.[5] In determining whether there is substantial evidence, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered.[6] It is not an appellate court's province to try issues of fact; we simply examine the record to determine if there is substantial evidence to support the jury verdict.[7] The weight and value of testimony is a matter within the exclusive province of the jury.[8]

---

[3]B&A Electric was awarded $151,880; Megehee Fence Contracting was awarded $14,926.88; Grimes Dozer Service was awarded $12,977.50; and James Griffith was awarded $20,337.50.

[4]*Hunter v. Keck*, 2020 Ark. App. 233, 600 S.W.3d 109.

[5]*Id.*
[6]*Id.*

[7]*Id.*

[8]*Id.*

13

The City contends that the evidence was insufficient to support the jury's verdict in favor of the contractors for their breach-of-contract claims. In order to prove a breach-of-contract claim, one must prove the existence of an agreement, breach of the agreement, and resulting damages.[9] Here, the City contends— and the contractors concede— that there was no direct contract between the parties. At all relevant times, the City had an agreement with RVSC, and RVSC had agreements with the contractors.

The contractors argue that RVSC was an agent for the City with direct authority to act and contract on the City's behalf. A party asserting the existence of an agency relationship has the burden of proving that an agency relationship exists.[10] The two essential elements of an agency relationship are (1) that an agent has the authority to act for the principal and (2) that the agent act on the principal's behalf and be subject to the principal's control.[11] The City contends that there is no evidence of an agency relationship between it and RVSC; however, the contractors list a number of things that they contend support the existence of such a relationship: (1) the City approved invoices before they were paid; (2) the City represented to B&A Electric that the City viewed the project as a collaboration between the City and RVSC; (3) the City took possession of job materials that were provided by the contractors but for which RVSC did not make payment; (4) the City retained all

[9]*Stone v. Read*, 2022 Ark. App. 349.

[10]*Hardin v. Bishop*, 2013 Ark. App. 395, 430 S.W.3d 49.

[11]*Id.*

materials and improvements, regardless of whether the City had paid for them; (5) the City monitored the project regularly, including daily monitoring, on a frequent basis; (6) the City controlled distribution of money; (7) the City monitored RVSC's checks and bank statements; (8) a city engineer would look at the work and approve it; (9) contractors submitted budgeting numbers directly to the City; (10) contractors and the City worked together to incorporate contractor figures into the City's resolution and agreement; (11) the City chose to waive any performance bond and rely directly on the budget numbers provided by the contractors; and (12) a city employee and a city auditor met directly with contractors to review the work of the contractors. Despite the items listed by appellees to prove an alleged agency relationship between the City and RVSC, there was no evidence or testimony by any of the parties that RVSC was indeed the City's agent. Although the City gave RVSC the authority to hire the contractors, it had little involvement concerning which contractors RVSC hired or how the contractors performed their jobs except for making inspections when thresholds were met. The City denied the existence of an agency relationship, and RVSC did not offer any testimony to support a finding of such a relationship. As a matter of fact, Webb testified that RVSC hired the contractors, that the contractors answered to RVSC, and that RVSC was responsible for paying them. Even if the contractors believed they had a contractual relationship with the City via their verbal contracts with RVSC, belief alone is not enough to support a finding that RVSC was an agent for the City.

The City also maintains that there can be no apparent or implied agency authority imputed against it. The City is correct that an actual agency relationship has to exist, even

15

if it appeared that RVSC had the authority to bind the City. We have already determined that there was no actual agency relationship between the City and RVSC; therefore, because the City is a sovereign, there can be no apparent or implied agency relationship between the parties.[12] Accordingly, the jury's verdict in favor of the contractors' breach-of-contract claims is not supported by substantial evidence, and we reverse and dismiss.

Reversed and dismissed.

ABRAMSON and GLADWIN, JJ., agree.

*Gilker & Jones, P.A.*, by: *Michael R. Jones*, for appellant.

*Walters, Allison, Parker & Estell*, by: *Derick Allison*, for appellees.

---

[12]*See City of Bryant v. Collins*, 2011 Ark. App. 713, 386 S.W.3d 699.